Jeffrey A. Udell (JU0411)
OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP
Park Avenue Tower,
65 East 55th Street
New York, New York 10022
(212) 451-2300
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| P & E PROPERTIES, INC., <br><br> Plaintiff, <br><br> -against- <br><br> UNITED NATURAL FOODS, INC. and MILLBROOK DISTRIBUTION SERVICES INC., <br><br> Defendants. | No. 08 Civ. <br><br> COMPLAINT |

Plaintiff P & E Properties, Inc. ("P & E"), by its attorneys, Olshan Grundman Frome Rosenzweig & Wolosky LLP, for its Complaint, allege as follows:

### Nature of the Case

1.  Plaintiff P & E brings this action to enforce the contractual obligations of defendant Millbrook Distribution Services Inc. ("Millbrook"), shamelessly abandoned by Millbrook as a result of the unlawful interference of co-defendant United Natural Foods, Inc. ("UNFI").

2.  For the past approximately ten years, Millbrook and P & E have enjoyed a productive contractual relationship in which Millbrook -- a distributor of specialty food, health and beauty aids -- has engaged P & E to provide administrative and executive functions for Millbrook, such as general accounting, financial, legal and information-technology services. In February 2007, P & E and Millbrook entered into their current governing general administration

564150-2

services agreement (the "Services Agreement"), pursuant to which, Millbrook contracted to pay P & E, in exchange for the latter's services, both: (i) an annual management fee of $300,000, in equal monthly installments and (ii) reimbursement for P & E's costs in providing such services.

3. In November 2007, Millbrook's parent company was merged with and into a wholly-owned subsidiary of UNFI. Immediately thereafter, UNFI deliberately and wrongfully caused Millbrook to violate its contractual obligations to P & E. Upon assuming de facto control over Millbrook, UNFI shockingly caused Millbrook to stop payment on over $800,000 in checks that had already been prepared by Millbrook to satisfy obligations that it owed to P & E. Moreover, Millbrook has otherwise, since then, utterly failed to honor its obligations under the Services Agreement to remunerate P & E.

4. P & E has been damaged in an amount in excess of $1,000,000. This action seeks recovery for such damage and other relief.

### Jurisdiction and Venue

5. This Court has subject-matter jurisdiction over this case, pursuant to 28 U.S.C. §1332(a), because the action is between the citizen of one State and the citizens of another State, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. The Court has personal jurisdiction over defendants UNFI and Millbrook, as they each transact business and supply services in New York within the meaning of Section 302 of the New York Civil Practice Law and Rules. Moreover, Millbrook consented to such jurisdiction by the express terms of the Services Agreement.

7. Venue is appropriate in this District pursuant to: (i) 28 U.S.C. §1391(a), as a substantial part of the events or omissions giving rise to the claims herein occurred in this

District; and (ii) 28 U.S.C. §1391(c), as defendants UNFI and Millbrook "reside" in this District for purposes of venue because they are subject to personal jurisdiction here.

## The Parties

8. Plaintiff P & E is a privately-owned corporation organized under the laws of the State of New York, with its principal place of business located at 444 Madison Avenue, in Manhattan. P & E is a provider of administrative and executive services.

9. Defendant UNFI, upon information and belief, is a public company trading on the Nasdaq market under the symbol "UNFI." Upon information and belief, UNFI is a Delaware corporation with its principal place of business located in Dayville, Connecticut, and it distributes natural and organic foods and related products in the United States.

10. Defendant Millbrook, upon information and belief, is a Delaware corporation with its principal place of business located in Leicester, Massachusetts. Millbrook distributes specialty food items (including ethnic, kosher, gourmet, organic and natural foods), health and beauty care items and other non-food items to more then 9,000 retail locations. Since November 2, 2007, Millbrook is and has been wholly owned by a wholly-owned subsidiary of UNFI.

## Factual Allegations

A. <u>The Services Agreement</u>

11. For approximately ten years, plaintiff P & E has, pursuant to contract, supplied defendant Millbrook with administrative services of the kind more fully described below. On or about February 15, 2007, P & E and Millbrook entered into their current contract -- the Services Agreement -- a copy of which is attached hereto as Exhibit A.

12. Under the Services Agreement, P & E agreed to provide Millbrook with certain administrative and executive functions, including, but not limited to: general accounting and financial services, tax planning advice and the coordinating and filing of federal and state

564150-2

returns, managing the annual audit and quarterly reviews with Millbrook's outside accountants, managing Millbrook's Securities and Exchange Commission reporting, providing financial reporting assistance, assisting in the development of long-term corporate strategy, overseeing reporting to Millbrook's bank lenders and investors, assisting with the administration of Millbrook's payroll, insurance and benefit plans, providing legal services, preparing documentation relating to Millbrook's general corporate administration, providing assistance with Millbrook's information systems, providing assistance with labor negotiations, procuring and negotiating investments in real property, maintaining files of corporate and commercial documentation, and providing other general services to Millbrook as that company might request from time to time. (*See* Services Agreement at Section 1(b)).

13. The term of the Services Agreement was for three years, commencing February 15, 2007. (*See* Services Agreement at Section 2).

14. In consideration for its services, P & E was to be compensated by Millbrook as follows: "(i) an annual management fee of $300,000, which shall be payable in equal monthly installments, and (ii) an amount to reimburse [P & E] for [its] costs in providing the Services," also to be paid on a monthly basis. (*See* Services Agreement at Section 3(a)). The Services Agreement also provided as follows, with respect to the calculation of the costs for which P & E was to be reimbursed:

> (b) In determining the costs for providing the Services as contemplated by clause (ii) of Section 3(a), [P & E] shall calculate the amount based upon the (i) all in direct costs of its utilizing its personnel (such as salary, benefits, insurance) (ii) actual out-of-pocket expenses incurred in providing the Services and (iii) a reasonable charge for indirect costs of [P & E] which shall be based upon a reasonable and equitable allocation of [P & E's] corporate overhead.

> (c)    [Millbrook] shall also reimburse [P & E] for any extraordinary documented out-of-pocket expenses incurred in providing the Services, the incurrence of which has been approved in advance by [Millbrook]. As a condition to the reimbursement of any such extraordinary expenses, [P & E] shall provide [Millbrook] which [sic] such documentation as [Millbrook] may reasonably request with respect to the incurrence of any such expenses.

(*See* Services Agreement at Section 3(b) and (c)).

15.    The Services Agreement also included mutual indemnification provisions. Millbrook's indemnity obligations were set forth as follows:

> [Millbrook] agrees to indemnify [P & E], and [P & E's] members, stockholders, directors, managers, officers, employees, attorneys and agents (each a "Servicer Indemnified Person") and to hold [P & E] and each such Servicer Indemnified Person harmless from and against any claim, action, suit, damage, liability cost or expense (including, without limitation, attorneys' fees and expenses and court costs) incurred by [P & E] and/or any Servicer Indemnified Person in connection with any claim, action, suit or other proceeding due to, based upon or relating to a breach of this Agreement by [Millbrook].

(*See* Services Agreement at Section 8).

B.    The Merger

16.    Commencing in or about the Spring of 2007, UNFI began negotiations with Millbrook's then parent company, Distribution Holdings, Inc. ("DHI"), regarding a possible acquisition (the "Merger") by UNFI of DHI, and thus DHI's wholly owned subsidiary, Millbrook.

17.    Such negotiations were protracted, and continued for several months.

18.    On or about October 5, 2007, UNFI and its specially-created wholly-owned subsidiary entered into a definitive merger agreement (the "Merger Agreement") with DHI and Millbrook, pursuant to which, DHI would merge with and into UNFI's subsidiary. Thereafter,

5

564150-2

Millbrook would be wholly-owned by UNFI's wholly-owned subsidiary, and thus Millbrook would be a "grandchild" corporation of UNFI.

19. On or about November 2, 2007 (the "Closing Date"), the companies completed the Merger contemplated in the Merger Agreement.

C. The Retention Compensation

20. Some time in the Spring of 2007, months before the Closing Date of the Merger, P & E promised several of its employees retention compensation of varying amounts. Exercising its business discretion, P & E believed that such payments would be essential toward ensuring the continued and productive services of such employees during the period of negotiations leading up to the contemplated sale of Millbrook to UNFI.

21. During that negotiation period, the P & E employees indeed performed as expected, such that P & E was able to continue to provide the necessary services contemplated under the Services Agreement.

22. Accordingly, shortly before the Closing Date, P & E prepared to issue its employees the retention compensation it had promised them and that the employees had earned. Pursuant to the Services Agreement, P & E sought payment from Millbrook for such compensation.

23. Prior to the Closing Date, checks, drawn on a Millbrook-owned account and made payable to the respective P & E employees, were prepared and executed by a duly authorized corporate officer of Millbrook.

564150-2

D.  <u>Millbrook Breaches the Services Agreement</u>

24. Shortly after the November 2, 2007 Closing Date of the Merger, Millbrook -- at that point newly owned by the subsidiary of UNFI -- wrongfully stopped payment on the retention compensation checks issued to the P & E employees.

25. Upon information and belief, this stop-payment action was undertaken at the direction of the Chief Financial Officer of UNFI.

26. Additionally, since that time, Millbrook has utterly failed to fulfill its obligation to remit to P & E the monthly installments of the $300,000 annual management fee, plus expenses, for the months of November 2007, December 2007 and January 2008, despite due demand by P & E for the same.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract, Against Millbrook)

27. Plaintiff restates the allegations set forth in paragraphs 1 to 26.

28. As set forth above, Millbrook and P & E entered into the Services Agreement, setting forth the respective obligations of those two entities.

29. Thereafter, pursuant to the Merger Agreement, all debts, liabilities, obligations and duties of Millbrook that existed prior to the Closing Date continued to be the debts, liabilities, obligations and duties of Millbrook (under its new ownership by the UNFI corporate family) after the Closing Date.

30. Accordingly, Millbrook was and continues to be bound to honor the obligations it incurred to P & E, prior to the Merger, under the Services Agreement.

31. P & E has complied in all material respects with the terms of the Services Agreement.

32. Millbrook has breached that Agreement by refusing to compensate P & E, as provided therein.

33. Specifically, among other things, Millbrook has failed to remit to P & E, despite a due demand for the same, P & E's just compensation for:

    (a) the monthly installments of the $300,000 annual management fee, plus expenses, for the months of November 2007, December 2007 and January 2008; and

    (b) P & E's costs in providing retention compensation to ten of its employees.

34. By reason of the foregoing, P & E has been damaged in an amount to be determined at trial, no less than $1,000,000.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment)

35. Plaintiffs restate the allegations set forth in paragraphs 1 to 26.

36. As set forth above, the Services Agreement set forth all of its material terms and was executed by duly authorized representatives of P & E and Millbrook, respectively.

37. P & E has fully performed under the terms of the Services Agreement.

38. Accordingly, plaintiffs seek a judgment from this Court, declaring that the Services Agreement is a valid and enforceable agreement, and that Millbrook is obligated to compensate P & E under the terms of that Agreement.

## THIRD CLAIM FOR RELIEF
### (Tortious Interferance with Contract, Against UNFI)

39. Plaintiffs restate the allegations set forth in paragraphs 1 to 26.

40. As set forth above, the Services Agreement was a valid and binding contract between P & E and Millbrook.

41. UNFI was well aware of both the existence of and the terms of the Services Agreement.

42. By its wrongful and malicious conduct, UNFI intentionally procured Millbrook's breach of the Services Agreement.

43. P & E has been damaged thereby in an amount to be determined at trial, no less than $1,000,000.

WHEREFORE, plaintiff respectfully requests that the Court enter judgment as follows:

A) Awarding plaintiff compensatory damages in an amount to be determined at trial, no less than $1,000,000, plus interest thereon;

B) Declaring the Services Agreement to be a valid and enforceable agreement between P & E and Millbrook, and declaring that Millbrook is obligated to compensate P & E under the terms of the Services Agreement;

C) Awarding plaintiff punitive damages against UNFI, for its flagrant and malicious interference with P & E's contract with Millbrook; and

D) Granting such other and further relief that the Court deems just and proper, together with attorneys' fees and the costs and disbursements of this action.

Dated: New, York, New York
January 22, 2008

OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP

By: _____
Jeffrey A. Udell (JU0411)
*Attorneys for Plaintiff*
Park Avenue Tower
65 East 55th Street
New York, New York 10022
(212) 451-2300

# Exhibit A

GENERAL ADMINISTRATION SERVICES AGREEMENT

GENERAL ADMINISTRATION SERVICES AGREEMENT, dated as of February 15 2007 (this "Agreement"), by and between MILLBROOK DISTRIBUTION SERVICES INC., a Delaware corporation (the "Company"), and P & E PROPERTIES, INC., a New York corporation (the "Servicer").

RECITALS

WHEREAS, the Company is in the business of distributing specialty food, health and beauty aids and general merchandise products to its customers; and

WHEREAS, the Company has engaged the Servicer to provide certain administrative and executive functions for and on behalf of the Company; and wants to continue that arrangement as more fully set forth herein; and

WHEREAS, the Servicer is willing to provide those functions upon the terms and provisions, and subject to the conditions, set forth herein.

NOW, THEREFORE, in consideration of the premises, agreements and the mutual covenants herein contained, and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1.    Engagement of the Servicer.

(a)    The Company hereby retains the Servicer to provide the Services (defined as specified in Section 1(b) hereof) to the Company and any subsidiaries of the Company (now existing or hereafter established) during the Term (as hereinafter defined), and the Servicer hereby agrees to provide the Services to the Company and any such subsidiaries during the Term.

(b)    The Services shall include the following:

(i)    providing general accounting and financial services, including treasury and cash management;

(ii)   providing tax planning advice and coordinating the filing of Federal and state tax returns;

(iii)  managing the annual audit and quarterly reviews with the Company's outside accounting firm;

(iv)   managing the Company's SEC related reporting;

(v)    providing financial reporting assistance, including assistance in preparing budgets and financial forecasts;

(vi)   assisting in the development of long-term corporate strategy, including the development of three (3) year plans;

(vii) overseeing reporting to the Company's bank lenders and other lenders and investors, and engaging in negotiations with any of those entities on an as needed basis;

(viii) assisting with the administration of payroll, general insurance and employee benefit plans obligations and other employee related services;

(ix) providing legal services, including managing and overseeing the engagement of outside providers of legal services and government relations services;

(x) preparing documentation relating to the Company's general corporate administration, including documentation necessary to maintain the Company in good standing in various jurisdictions where the Company conducts business;

(xi) providing assistance with respect to the Company's information systems including periodic reviews and coordination of the implementation of upgrades and new systems;

(xii) providing assistance with labor negotiations;

(xiii) procuring and negotiating investments in real property, including leases, providing advice with respect to the Company's owned and leased real property;

(xiv) maintaining files of corporate and commercial documentation; and

(xv) providing such other services for the Company, as the Company may reasonably request from time to time.

(c) In certain instances, the Services may be provided to the Company's parent, Distribution Holdings, Inc., a Delaware corporation.

(d) The Services will be performed by personnel of the Servicer qualified in the applicable area of service. The Services will be performed in good faith and to the best of the Servicer's capabilities. The Servicer shall comply with all applicable laws, rules and regulations (federal, state, local and foreign) in connection with its provision of the Services. The Servicer shall be responsible for informing its employees about all such laws, rules and regulations, including without limitation, applicable securities laws.

Section 2.    Term.

The Term of the engagement of the Servicer hereunder shall be for a period of three (3) years from the date hereof, unless terminated earlier as provided for herein (as it may be extended in accordance with this Section 2, the "Term"). The Term shall automatically extend for successive periods of three (3) years form the then expiration date, unless terminated earlier as provided for herein and, unless either the Company or the Servicer notifies the other not later than ninety (90) days prior to the then expiration date that such party does not intend for the Term to automatically extend.

Section 3.   Compensation.

(a)   In consideration of the performance of the Services by the Servicer, the Company shall pay the Servicer (i) an annual management fee of $300,000 which shall be payable in equal monthly installments, and (ii) an amount to reimburse the Servicer for the Servicer's costs in providing the Services. The amount payable pursuant to clause (ii) of the immediately preceding sentence shall also be paid on a monthly basis, based upon the Servicer's best estimate of the costs of the Services for the month, with a "true-up" within thirty (30) days after the end of the annual period.

(b)   In determining the costs for providing the Services as contemplated by clause (ii) of Section 3(a), the Servicer shall calculate the amount based upon the (i) all in direct costs of its utilizing its personnel (such as salary, benefits, insurance) (ii) actual out-of-pocket expenses incurred in providing the Services and (iii) a reasonable charge for indirect costs of the Servicer which shall be based upon a reasonable and equitable allocation of the Servicer's corporate overhead.

(c)   The Company shall also reimburse the Servicer for any extraordinary documented out-of-pocket expenses incurred in providing the Services, the incurrence of which has been approved in advance by the Company. As a condition to the reimbursement of any such extraordinary expenses, the Servicer shall provide the Company which such documentation as the Company may reasonably request with respect to the incurrence of any such expenses.

(d)   To the extent any chargeable costs for the Services are also in part services provided by the Servicer to an entity other than the Company, the Servicer shall allocate such costs between the Company and such other entity in an equitable manner.

Section 4.   Independent Contractor.

The details of the Servicer will act as an independent contractor under the terms of this Agreement and not as a legal representative, partner or joint venturer of the Company for any purpose whatsoever. Nothing in this Agreement shall be construed: (i) to give either party the power to direct or control the daily activities of the other party, or (ii) to constitute the parties as principal and agent, partners, or otherwise as participants in a joint undertakings. The Servicer shall have no power or authority to create or assume any obligation or to make any representation or commitment on behalf of the Company, to waive any right that the Company may have against any other person or entity or to legally bind the Company in any way.

Section 5.   Representations and Warranties of the Servicer.

The Servicer hereby represents and warrants to the Company that: (i) the Servicer has the personnel, facilities and resources required to discharge and will discharge the Services contemplated by this Agreement in a timely and efficient manner, and (ii) the Servicer has the administrative, business and technical experience and expertise required to perform and will perform the Services in a competent and professional manner.

Section 6.   Confidential Information.

(a)   During Term and thereafter, the Servicer shall not directly or indirectly, under any circumstance: (i) disclose any Confidential Information (as such term is hereinafter defined); (ii) act so as to impair the confidential or proprietary nature of any such Confidential

Information; or (iii) offer or agree to, or cause or assist in the inception or continuation of, any such disclosure or impairment of any such Confidential Information or trade secret, unless consented to in writing by the Company. All Confidential Information is and shall remain the sole and exclusive property of the Company. For purposes hereof, the term "Confidential Information" shall mean any and all of the following (regardless of the medium in which maintained or stored) confidential or proprietary information or material not in the public domain about or relating to any aspect of the business activities, plans, prospects or strategies or the Company including, without limitation, financial information and projections; research and development plans or projects; data and reports; computer materials such as programs, instructions, source codes, object codes and printouts; formulas; product-testing information; business improvements; processes; manufacturing processes; intellectual property strategies, including patent, trademark and intellectual property strategies licensing strategies; marketing and selling strategies; strategic business plans (whether pursued or not); budgets; licenses; pricing, pricing strategy and cost data; information regarding the skills and compensation of employees; the identities of customers and potential customers; forecasts, marketing techniques; the identities of suppliers, vendors and contractors; the terms of contracts or agreements, and any other information or data which is not public and/or of a confidential nature relating to the business of the Company. In the event that the Servicer becomes legally required to disclose any Confidential Information, the Servicer to the extent practicable, will provide the Company with prior written notice thereof so that the Company may seek a protective order or other appropriate remedy or waive compliance with the provisions of this Section 6(a) to permit a particular disclosure. In the event that such protective order or other remedy is not obtained, or that the Company waives compliance with the provisions of this Section 6(a) to permit a particular disclosure, Servicer shall only disclose that portion of the Confidential Information which Servicer is advised by its legal counsel is legally required to be disclosed. If required, the Servicer will, at the Company's cost and expense, cooperate with the efforts of the Company to obtain a protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information disclosed. For purpose hereof Confidential Information shall not include any information (i) that is publicly known at the time of its disclosure other than through a breach of this Agreement by the Servicer; (ii) is lawfully obtained by the Servicer party from a third party not bound in a confidential relationship to the Company or (iii) was already known by the Servicer prior to its disclosure.

(b)   The Servicer acknowledges that if the Servicer or any of its affiliates should breach or threaten to breach any provision of Section 6(a), the damages to the Company may be substantial, although difficult to ascertain, and money damages will not afford the Company an adequate remedy. Therefore, if Section 6(a) violated or breached by the Servicer or threatened to be violated or breached, in whole or in part, the Company shall be entitled to seek specific performance and injunctive relief (without being required to post a bond or other security or being required to establish irreparable harm), without prejudice to other remedies the Company may have at law, in equity, or otherwise.

(c)   Upon the termination of the Agreement or expiration of the Term of this Agreement, the Servicer will promptly deliver to the Company, or at the Company's written instruction, destroy, all documents, data, drawings, manuals, letters, notes, reports, electronic mail, recordings, and copies thereof, of or pertaining to the Company and its business and/or which contain or are based upon any Confidential Information in the Servicer's possession or

control. Nothing herein shall constitute a license of any property or information belonging to the Company.

Section 7.   Termination.

(a)   This Agreement may be terminated by either the Company or the Servicer in the following circumstances, without judicial action or arbitration:

   (i)   the breach of any material provision set forth in this Agreement by the other party hereto or the failure by such other party to observe or perform any material agreement to be observed or performed by such other party hereto, which breach or failure is not remedied within thirty (30) days after written notice thereof is given by the non-breaching party; or

   (ii)   the institution by the other party of any proceedings under applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws or the institution of involuntary proceedings under any such law against such other party which proceedings are not dismissed or stayed within sixty (60) days of the commencing thereof; or

   (iii)   the making of a general assignment for creditors by the other party hereto or such party acknowledging or admitting in writing its inability to satisfy its debts as such debts become due.

(b)   Termination shall not be the exclusive remedy for a breach of this Agreement for which termination has occurred pursuant to Section 7(a)(i) hereof. In such an instance the non-breaching party shall be entitled to all of its rights and remedies (whether at law, in contact, in equity or otherwise) with respect to the matter giving rise to the breach.

Section 8.   Indemnification.

(a)   The Servicer agrees to indemnify the Company, and the Company's members, stockholders, directors, managers, officers, employees, attorneys and agents (each a "Company Indemnified Person") and to hold the Company and each such Company Indemnified Person harmless from and against any claim, action, suit, damage, liability cost or expense (including, without limitation, attorneys' fees and expenses and court costs) incurred by the Company and/or any Company Indemnified Person in connection with any claim, action, suit or other proceeding due to, based upon or relating to a breach of this Agreement by the Servicer.

(b)   The Company agrees to indemnify the Servicer, and the Servicer's members, stockholders, directors, managers, officers, employees, attorneys and agents (each a "Servicer Indemnified Person") and to hold the Servicer and each such Servicer Indemnified Person harmless from and against any claim, action, suit, damage, liability cost or expense (including, without limitation, attorneys' fees and expenses and court costs) incurred by the Servicer and/or any Servicer Indemnified Person in connection with any claim, action, suit or other proceeding due to, based upon or relating to a breach of this Agreement by the Company.

Section 9.   Entire Agreement; Amendment.

This Agreement contains the entire understanding and agreement of the parties relating to the subject matter hereof and it supersedes all prior and/or contemporaneous

understandings and agreements of any kind and nature (whether written or oral) among the parties with respect to such subject matter, all of which are merged herein. This Agreement may not be modified, amended, altered or supplemented, except by a written agreement executed by each of the parties hereto.

Section 10.   Waiver.

Any waiver by the party, of any breach of or failure to comply with any provision or condition of this Agreement by the other party shall not be construed as, or constitute, a continuing waiver of such provision or condition, or a waiver of any other breach of, or failure to comply with, any other provision or condition of this Agreement, any such waiver to be limited to the specific matter and instance for which it is given. No waiver of any such breach or failure or of any provision or condition of this Agreement shall be effective unless in a written instrument signed by the party granting the waiver. No failure or delay by either party to enforce or exercise its rights hereunder shall be deemed a waiver hereof, nor shall any single or partial exercise of any such right or any abandonment or discontinuance of steps to enforce such rights, preclude any other or further exercise thereof, at any time whatsoever, or the exercise of any other right.

Section 11.   Governing Law; Jurisdiction.

(a)   This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in that State, without regard to any of its principles of conflicts of laws or other laws which would result in the application of the laws of another jurisdiction.

(b)   Each of the parties unconditionally and irrevocably consents to the exclusive jurisdiction of the courts of the State of New York, located in New York county and the Federal District Court for the Southern District of New York with respect to any suit, action or proceeding arising out of or relating to this agreement or the transactions contemplated hereby, and each of the parties hereby unconditionally and irrevocably waives any objection to venue in any such court. Each of the parties hereby unconditionally and irrevocably waives the right to a trial by jury in any action, suit or proceeding arising out of or relating to this agreement or the transactions contemplated hereby.

Section 12.   Notices.

Notices.   All notices, demands, consents, requests, instructions and other communications to be given or delivered or permitted under or by reason of the provisions of this Agreement or in connection with the transactions contemplated hereby shall be in writing and shall be deemed to be delivered and received by the intended recipient as follows: (a) if personally delivered, on the business day of such delivery (as evidenced by the receipt of the personal delivery service), (b) if mailed certified or registered mail return receipt requested (with all costs prepaid), four (4) business days after being mailed, (c) if delivered by a recognized overnight courier service of recognized standing (with all charges having been prepaid), on the business day of such delivery (as evidenced by the receipt of the overnight courier service), or (d) if delivered by facsimile transmission, on the business day of such delivery if sent by 6:00 p.m. in the time zone of the recipient, or if sent after that time, on the next succeeding business day (as evidenced by the printed confirmation of delivery generated by the sending party's telecopier machine). If any notice, demand, consent, request, instruction or other communication

cannot be delivered because of a changed address of which no notice was given (in accordance with this Section 12), or the refusal to accept same, the notice, demand, consent, request, instruction or other communication shall be deemed received on the second business day the notice is sent (as evidenced by a sworn affidavit of the sender). All such notices, demands, consents, requests, instructions and other communications will be sent to the following addresses or facsimile numbers as applicable:

If to the Company:

Millbrook Distribution Services Inc.
P.O. Box 35, Route 56
Leicester, MA 01524
Facsimile No. (508) 892-8171
Attention: Mr. Robert A. Sigel
           President

with a copy to:

Millbrook Distribution Services Inc.
444 Madison Avenue, Suite 601
New York, NY 10022
Attention: James A. Cohen, Esq.
           Senior Vice President – Legal Affairs
Facsimile No.: (212) 888-5025

If to the Servicer:

P&E Properties, Inc.
444 Madison Avenue, Suite 601
New York, NY 10022
Attention: Mr. Richard A. Bernstein
           Chairman, President and Chief Executive Officer
Facsimile No.: (212) 888-5025

with a copy to:

Baker & McKenzie, LLP
1114 Avenue of the Americas
New York, NY 10036
Attention: Martin Eric Weisberg, Esq.
Facsimile No.: (212) 310-1783

Section 13.    Severability.

Should any provision of this Agreement be held to be invalid, illegal or unenforceable in any jurisdiction by a court of competent jurisdiction, that holding shall be effective only to the extent of such invalidity, illegally or unenforceability without invalidating

or rendering illegal or unenforceable the remaining provisions hereof, and any such invalidity, illegally or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. It is the intent of the parties that this Agreement be fully enforced to the fullest extent permitted by applicable law.

Section 14.    Assignment.

This Agreement and the rights and obligations hereunder may not be assigned by any party hereto without the prior written consent of the other parties hereby, except the Company may assign this Agreement to any transferee of all or substantially all of the assets of the Company. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Nothing herein is intended or shall be construed to confer upon or give to any person, any rights, privileges or remedies under or by reason of this Agreement.

Section 15.    Drafting History.

In resolving any dispute under, or construing any provision in under, this Agreement, there shall be no presumption made or inference drawn (a) because the attorneys for one of the parties drafted such provision of this Agreement, (b) because of the drafting history of the Agreement, or (c) because of the inclusion of a provision not contained in a prior draft or the deletion of a provision contained in a prior draft. The parties acknowledge and agree that this Agreement was negotiated and drafted with each party being represented by counsel of its choice and with each party having an equal opportunity to participate in the drafting of the provisions hereof.

Section 16.  Headings: Counterparts.

The section headings contained in this Agreement are inserted for reference purposes only and shall not affect in any way the meaning, construction or interpretation of this Agreement. Any reference to the masculine, feminine, or neuter gender shall be a reference to such other gender as is appropriate. References to the singular shall include the plural and vice versa. This Agreement may be executed in two (2) or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, and all of which, when taken together, shall constitute one and the same document. This Agreement may be executed by facsimile signature which shall constitute a legal and valid signature for purposes hereof. This Agreement shall become effective when one or more counterparts, taken together, shall have been executed and delivered by all of the parties.

IN WITNESS WHEREOF, each of the parties has executed this Agreement as of the date first above written.

MILLBROOK DISTRIBUTION SERVICES INC.

By: _____
    Name:
    Title:

P & E PROPERTIES, INC.

By: _____
    Name:
    Title: V.P.